IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LAKESHA GILLS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:11-CV-2962-BH |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the *Order of Transfer*, dated November 8, 2011, this case has been transferred for all further proceedings and entry of judgment.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed January 23, 2012 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed February 22, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, the plaintiff's motion is **DENIED**, the defendant's motion is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

## I. BACKGROUND[1]

### A.    *Procedural History*

Lakesha Gills (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. (R. at 3-5.)  She applied for disability insurance benefits and SSI in January 2008, alleging disability beginning September 5, 2007, due to anxiety, mental problems, and bipolar disorder.  (*Id*. at 122, 148.)  Her claims were

---

[1]  The background comes from the transcript of the administrative proceedings, which is designated as "R."

denied initially and upon reconsideration. (*Id*. at 82-87, 95-98.) Plaintiff requested a hearing before

an Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing on July

30, 2009. (*Id*. at 30-59, 99-100.) On March 23, 2010, the ALJ issued a decision finding her not

disabled. (*Id*. at 13-24.) The Appeals Council denied her request for review, making the ALJ's

decision the final decision of the Commissioner. (*Id*. at 3-5, 9.) Plaintiff timely appealed the

Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (*See*

doc. 1.)

**B.** *Factual History*

**1.      Age, Education, and Work Experience**

Plaintiff was born in 1976. (R. at 31.) She completed high school but was enrolled in special

education classes. (*Id*. at 31, 38.) She has past relevant work experience as a warehouse worker and

shampoo technician. (*Id*. at 31-36.)

**2.      Medical Evidence**

On September 8, 2006, Plaintiff visited the emergency room at Methodist Medical Center

(MMC) for anxiety attacks occurring over a 2 week period. (*Id*. at 389-90.) She was diagnosed with

anxiety and discharged with a prescription for Valium and instructions to follow-up with her doctor.

(*Id*. at 392.)

Plaintiff sought treatment at MMC's emergency room for shortness of breath on November

18, 2006. (*Id*. at 373.) She was diagnosed with exacerabated asthma and was treated with Solu-

Medrol, Atrovent, and albuterol. (*Id*. at 375.) MMC discharged her with prescriptions for Flovent,

Xopenex, and albuterol, and instructed her to follow-up with her doctor. (*Id*.) She returned the

following day–again complaining of shortness of breath. (*Id*. at 350.) She was diagnosed with

2

asthma and treated with Ventolin and Atrovent.  (*Id*. at 363.)  She was prescribed prednisone and Zithromax and told to see her doctor.  (*Id*. at 360.)

Plaintiff visited MMC's emergency room with complaints of anxiety on April 4, 2007.  (*Id*. at 343.)  After being treated with Ativan and Vistaril, she was discharged.  (*Id*. at 344.)  She returned on April 7, 2007, seeking treatment for anxiety and asthma.  (*Id*. at 320, 322, 328.)  She was prescribed prednisone and Mucinex and discharged with instructions to follow up with her doctor. (*Id*. at 330.)  She returned again but left without being seen on April 10, 2007.  (*Id*. at 320, 322.)

On April 16, 2007, Plaintiff visited Metrocare Services.  (*Id*. at 214-215.)  She reported that she was nervous, sad, and had daily crying spells.  (*Id*.)  She slept only 4 hours nightly, she had lost 20 pounds over 3 months, and her energy level was low.  (*Id*. at 215.)  Plaintiff admitting drinking alcohol daily for the past 6 months and using cocaine twice in recent  months.  (*Id*. at 215.)  She claimed she stopped using cocaine because it made her anxiety worse.  (*Id*.)  Plaintiff heard voices that told her to kill herself and her ex-husband and had visual hallucinations.  (*Id*.)  She related that her mother, two aunts, and an uncle had similar problems.  (*Id*.)  She denied paranoia but admitted to panic attacks as often as 6 times a day.  (*Id*.)  A private physician had treated her for depression and anxiety in the past with Zoloft and lorazepam, but she had been off her medication for six months.  (*Id*. at 214.)  Plaintiff related an attempted suicide (ingestion of rat poison) six months prior for which she did not seek medical treatment; she was sick all night but recovered.  (*Id*.)

Dr. Sylvia Moring noted that Plaintiff was alert, oriented, and cooperative.  (*Id*. at 215.)  Her speech was normal, coherent, logical, and goal directed; her memory was intact, but she had poor judgment and insight.  (*Id*.)  Dr. Moring diagnosed Plaintiff with recurrent major depressive disorder and gave an alternative diagnosis of paranoid schizophrenia.  (*Id*.)  She prescribed Prozac, Invega,

and lorazepam.  (*Id.*)  Plaintiff's treatment plan included taking her medication as prescribed, medication education and training to understand her illness and reduce symptoms, and referral for services with community agencies.  (*Id.* at 217.)

Plaintiff returned to Metrocare with complaints of continued depression on May 4, 2007. (*Id.* at 218, 222.)  She described anxiety attacks and nervousness, but denied any hallucinations, delusions, and suicidal or homicidal ideations.  (*Id.* at 222.)  She stopped taking her Prozac because it made her feel bad.  (*Id.*)  Advanced Practice Nurse (APN) Natasha Simmons substituted Celexa for Prozac, and prescribed Buspar and Invega.  (*Id.*)

On May 6, 2007, Plaintiff visited MMC's emergency room for chest pain.  (*Id.* at 426-27.) Her diagnoses were atypical chest pain and asthmatic bronchitis.  (*Id.* at 428.)  MMC discharged her with prescriptions for Medrol, Ventolin, and Zithromax; she was to follow-up with her doctor.  (*Id.*)

Plaintiff visited the emergency room at Parkland Health and Hospital System with complaints of anxiety, blurred vision, and shortness of breath on May 7, 2007.  (*Id.* at 296.)  Her diagnosis was anxiety, and she was treated with Ativan.  (*Id.* at 412.)  She was also given a prescription for lorazepam and told to see her doctor.  (*Id.* at 296, 415.)

Plaintiff visited Metrocare on June 7, 2007, complaining that she had a bad reaction to all of her medications and had to be treated with muscle relaxants.  (*Id.* at 227.)  She took Ativan for anxiety but was afraid to take other medications.  (*Id.*)  She denied suicidal ideations.  (*Id.*)  Her partner stated that Plaintiff had taken Zoloft previously, and that it worked.  (*Id.*)  APN Simmons prescribed Plaintiff Zoloft, Ativan, Buspar, and Invega.  (*Id.*)  Plaintiff returned to Metrocare on August 1, 2007, stating that her medication was helping with her depression and denying any suicidal or homicidal ideations, hallucinations, and delusions.  (*Id.* at 231.)  She was instructed to

4

continue taking her medications as prescribed.  (*Id.*)  On August 31, 2007, Plaintiff again visited Metrocare–this time complaining of anxiety attacks.  (*Id.* at 235.)  Her depression was better, she was sleeping 5-8 hours each night, and she denied hallucinations, delusions, and suicidal or homical ideations.  (*Id.*)  APN Simmons counseled her to continue taking her medications.  (*Id.*)

After missing her last scheduled appointment, Plaintiff visited Metrocare as a walk-in on December 10, 2007.  (*Id.* at 210-212, 237.)  She had run out of medication a week before.  (*Id.* at 210.)  Plaintiff suffered from increased depression, anxiety, and paranoia, but denied hallucinations, delusions, suicidal ideation, and alcohol use.  (*Id.* at 210, 240.)  Her diagnosis was changed to paranoid schizophrenia, and her medications were Ativan, Buspar, and Zoloft.  (*Id.*)  Her Adult-TRAG Dimension Ratings were 3 on employment problems; 2 on risk of harm, support needs, psychiatric related hospitalizations, and housing instability; and 1 on co-occurring substance use and criminal justice involvement.  (*Id.*)  Her Global Assessment of Functioning (GAF)[2] score was 45.  (*Id.*)  Her treatment plan included taking her medication as prescribed, medication education and training to understand her illness and reduce symptoms, and services with community agencies.  (*Id.* at 211.)  Plaintiff returned on January 7, 2008, complaining of increased agitation, irritability, depression, crying spells, difficulty sleeping, racing thoughts, and poor memory.  (*Id.* at 245.)  She had neither suicidal nor homicidal ideations and denied alcohol use.  (*Id.* at 245, 247.)  APN Simmons described Plaintiff as alert, oriented, and appropriately groomed.  (*Id.* at 245.)  She prescribed Plaintiff valproic acid, increased her dosage of Zoloft, and continued her other

---

[2] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of forty indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") p. 32 (4th ed. 1994).

medications.  (*Id*. at 245-46.)

On March 21, 2008, Plaintiff again visited Metrocare as a walk-in.  The treatment notes showed she was inconsistent in keeping her appointments.  (*Id*. at 283.)  She reported running out of medication 2-3 weeks before, and she had hallucinations, sleep problems, and racing thoughts as well as poor memory, confusion, and blackouts.  (*Id*. at 273, 286.)  She also described an incident of self-mutilation during which she cut herself with scissors all day long.  (*Id*. at 273.)  Plaintiff admitted to drinking but said that she did not drink as often as before, e.g., 5 times a day.  (*Id*.)  Her diagnosis was listed as paranoid schizophrenia, and her medications were Zoloft, lorazepam, and valproic acid.  (*Id*.)  Her Adult-TRAG Dimension Ratings were  5 on employment problems; 3 on risk of harm, functional impairment, and housing instability; 2 on support needs and co-occurring substance use; and 1 on psychiatric-related hospitalizations and criminal justice involvement.  (*Id*.)  Her Global Assessment of Functioning (GAF) score was 45.  (*Id*.)  Her treatment plan included taking her medication as prescribed and attending appointments; medication education and training to understand her illness and reduce symptoms; education about the negative effects of mixing drugs and alcohol with prescription medications; education on coping skills, independent living, stress management, and recovery benefit and relapse training; and services with community agencies.  (*Id*. at 274-75)  APN Simmons restarted Plaintiff's medications and added Seroquel.  (*Id*. at 286.)

Plaintiff saw Dr. George R. Mount, a clinical psychologist, for a consultative clinical interview and mental status exam on March 25, 2008.  (*Id*. at 250-252.)  She was cooperative, casually dressed, and well-groomed.  (*Id*. at 250.)  Her chief complaints were schizophrenia, bipolar disorder, anxiety, and depression.  (*Id*.)  Her medications included clonazepam, sertraline, valproic acid, buspirone, and Seroquel.  (*Id*. at 251.)

Plaintiff reported that her uncle raped her at age 10 and that there were other incidents of abuse and sexual assault.  (*Id*. at 250.)  She admitted a history of alcohol abuse but denied any current problem or any other drug use.  (*Id*. at 251.)  She had suicidal thoughts and had attempted suicide once.  (*Id*.)  Plaintiff also described an occasion when she stabbed herself with scissors because voices told her to do it.  (*Id*.)  She had low energy, and felt guilty, worthless, and like she was being punished.  (*Id*.)  She completed high school although she was enrolled in special education courses.  (*Id*.)  She read during the interview but denied understanding what she read. (*Id*.)  Plaintiff had difficulty sleeping.  (*Id*.)  She lived with her three daughters, cared for her own hygiene, and cooked "fast" things.  (*Id*.)  She seldom cleaned house–her mother and grandmother helped with household chores and shopping.  (*Id*.)  She could not read the paper but did watch TV. (*Id*.)  She could visit outside the home but tended to isolate herself from others.  (*Id*.)  She did not drive due to confusion and anxiety.  (*Id*.)  She forgot to take her medication and admitted that she could not manage her own money.  (*Id*.)

Dr. Mount noted that Plaintiff's behavior was restless.  (*Id*.)  Her speech was normal, her conversation was relevant and coherent, and her thought processes were goal-directed.  (*Id*.) Plaintiff reported visual and auditory hallucinations and suicidal thoughts "all the time." (*Id*. at 251-52.)  Her affect was depressed, and her mood was labile.  (*Id*. at 252.)  She was oriented, but her fund of information was below average, and her intellectual function was borderline.  (*Id*.) Plaintiff's remote memory was intact.  Her recent memory was impaired, e.g., she recalled 0/5 words after a 5 minute interval.  (*Id*.)  Her immediate memory was marginal, as demonstrated by her ability to repeat 5 digits forward and 3 digits backwards, and her inability to perform serial 7's or 3's.  (*Id*.) Dr. Mount described Plaintiff's judgment and reasoning as concrete and unimaginative, and her

insight as superficial.  (*Id.*)  He pronounced her prognosis as guarded.  (*Id.*)  Dr. Mount assigned Axis I diagnoses of severe recurrent major depressive disorder with psychotic features and chronic post-traumatic stress disorder (PTSD), a provisional Axis II diagnosis of borderline intellectual functioning, and an Axis III diagnosis of asthma.  (*Id.*)  He noted that psychosocial stressors and occupational problems impacted Plaintiff's condition.  (*Id.*)  Finally, he assigned her a GAF score of 40 and opined that she was incapable of managing any benefits she might receive.  (*Id.*)

On March 31, 2008, State Agency Medical Consultant (SAMC) Dr. Leela Reddy completed a psychiatric review technique (PRT) form for the period September 5, 2007 through March 31, 2008.  (*Id.* at 254-267.)  She noted the need for a residual functional capacity (RFC) assessment as well as a diagnosis of major depressive disorder that did not precisely satisfy the diagnostic criteria under Listing 12.04.  (*Id.* at 254, 257.)  She found that Plaintiff was mildly limited in her daily living activities and moderately limited in both social function and in concentration, persistence, or pace. (*Id.* at 264.)  Dr. Reddy found no episodes of decompensation of extended duration.  (*Id.*)  She concluded that the medical evidence did not fully support Plaintiff's alleged limitations.  (*Id.* at 266.)

Dr. Reddy also completed a mental RFC assessment.  (*Id.* at 268-70.)  In her Summary Conclusions, she found that Plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions, she was moderately limited in her ability to remember locations and work-like procedures, and she was markedly limited in her ability to understand and remember detailed instructions.  (*Id.* at 268.)  She was also markedly limited in her ability to carry out detailed instructions, and moderately limited in her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 268-69.)  Dr.

Reddy found Plaintiff not significantly limited in all other areas related to sustained concentration and persistence.  (*Id.*)  She also concluded that Plaintiff had no significant limitations in social interaction and adaptation.  (*Id.* at 269.)  In her Functional Capacity Assessment, she stated that Plaintiff could understand, remember, and carry out only simply instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.  (*Id.* at 270.)  She did *not* include any opinion regarding Plaintiff's ability to complete a normal workday and work week without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods.[3]  (*Id.*)

On May 16, 2008, Plaintiff visited Metrocare as a walk-in.  (*Id.* at 288, 293.)  She reported that she had not taken her medication for a few months.  (*Id.* at 293.)  She had difficulty sleeping, paranoia, auditory hallucinations, crying spells, anxiety attacks and an appetite problem, and she preferred to be alone.  (*Id.* at 288, 293.)  She also had thoughts of death and suicide.  (*Id.* at 288.)  She claimed she had not used alcohol in 6 months or drugs in over a year.  (*Id.*)  Plaintiff was counseled on the importance of keeping her appointments and taking her medication as prescribed.  (*Id.* at 294.)  She was restarted on Seroquel, and given prescriptions for valproic acid, Klonopin, Zoloft, and Buspar.  (*Id.* at 293.)

Plaintiff visited MMC's emergency room for an asthma attack on September 5, 2008.  (*Id.* at 420.)  She was counseled to stop smoking and told to follow-up with her doctor.  (*Id.* at 421.)

On September 11, 2008, SAMC Dr. Charles Lankford, Ph.D., affirmed Dr. Reddy's findings

---

[3]  Dr. Reddy noted that Plaintiff had moderate limitations in this area in her Summary Conclusions.  (R. at 269.)

on the PRT and mental RFC assessment forms.  (*Id*. at 317.)  He noted that Plaintiff's medical records from June 2007 showed that she was not interested in treatment, but had requested Avitan and was "popping it." (*Id*.)  He further noted that the medical records from April 2007 showed that Plaintiff used cocaine and drank, but she told the consultative examiner that she had not used alcohol since she was 19 and had never used street drugs.  (*Id*.)

Plaintiff returned to Metrocare on October 20, 2008.  (*Id*. at 445, 450.)  The treatment notes indicated she had not been to the clinic since May 2008.  (*Id*. at 450.)  She complained of suicidal thoughts, anxiety, aggression, auditory and visual hallucinations, difficulty sleeping, nightmares, and low appetite.  (*Id*. at 445, 450.)  She avoided people and had anxiety and depression, especially when she did not take her medication.  (*Id*.)  She was adequately groomed and cooperative, and her speech was normal.  (*Id*. at 445.)  Her mood was sad, although her affect was euthymic.  (*Id*.)  She was oriented; her thought processes were organized; her memory and attention were normal; and she demonstrated good insight, judgment, and impulse control.  (*Id*.)  Her diagnosis was paranoid schizophrenia.  (*Id*. at 450.)  Her Adult-TRAG Dimension Ratings were 3 on functional impairment and housing instability; 2 risk of harm and support needs; and 1 on psychiatric-related hospitalizations, employment problems, co-occurring substance abuse, and criminal justice involvement.  (*Id*.)  Her GAF score was 45.  (*Id*.)  She stated that she could not work due to severe anxiety and depression.  (*Id*.)  Her treatment plan included taking her medication as prescribed and attending appointments; education and training regarding coping and stress management; and community support services.  (*Id*. at 451.)  APN Simmons started her on Zoloft, Klonopin, Seroquel, and valproic acid.  (*Id*. at 445-46.)

On December 17, 2008, Plaintiff visited Metrocare with complaints of crying spells,

increased depression, panic attacks, and visual hallucinations. (*Id*. at 442.) She was in jail for 2 days, and did not have her medication. (*Id*.) APN Simmons noted that Plaintiff's mood was sad and her affect was labile. (*Id*.) Her memory and concentration were poor. (*Id*.) APN Simmons increased Plaintiff's dosages of Zoloft and Klonopin; she continued her other medications. (*Id*.)

Plaintiff saw Dr. Matthew Byerly on January 16, 2009, regarding participation in a random drug study. (*Id*. at 542.) He noted a clear history of a psychotic disorder with ongoing positive symptoms of delusions and auditory hallucinations. (*Id*.) She also reported past episodes of major depression and showed signs of mild depression during the visit. (*Id*.) She had never been hospitalized but had sought treatment at the emergency room for worsening symptoms. (*Id*.) She admitted prior alcohol dependence and cocaine abuse and denied current problems with either. (*Id*.) Dr. Byerly diagnosed her with schizophrenia and assessed her condition as moderately ill, but clinically stable. (*Id*. at 542-43.) After randomization, Plaintiff was selected to continue taking Seroquel. (*Id*. at 543.) Dr. Byerly continued her other psychotropic medications and asked her to return the following week. (*Id*.) Plaintiff returned on January 22, 2009. (*Id*. at 540.) She reported no change in her condition, and he again assessed her condition as moderately ill but clinically stable. (*Id*.) He continued her medications and told her to return in a week. (*Id*. at 541.) Plaintiff returned as instructed on January 30, 2009, and reported a mild increase in suspiciousness, depression, and anxiety. (*Id*. at 537.) Dr. Byerly assessed her condition as moderately ill but clinically stable. (*Id*.) He continued her medications and asked her to return in a week. (*Id*. at 538.)

Plaintiff missed her appointment with Metrocare on January 30, 2009. (*Id*. at 439.)

On February 3, 2009, Plaintiff saw Dr. Byerly again, reporting no significant changes. (*Id*. at 535.) Dr. Byerly assessed her condition as moderately ill but clinically stable, continued her

11

prescriptions, and instructed her to return the following week.  (*Id*. at 536.)  Plaintiff returned on February 10, 2009.  (*Id*. at 533.)  She reported that her mood was slightly better, but her symptoms were otherwise unchanged.  (*Id*.)  Dr. Byerly again assessed her condition as moderately ill but clinically stable, and he continued her prescriptions and asked her to return in a month.  (*Id*. at 534.) Upon return on March 9, 2009, Plaintiff complained of worsened depression and a panic attack which resulted in unconsciousness.  (*Id*. at 531.)  Dr. Byerly assessed her as moderately ill but clinically stable, continued her prescriptions, and told her to return in another month.  (*Id*. at 532.)

Plaintiff missed her appointment at Metrocare on March 23, 2009.  (*Id*. at 438.)

On April 6, 2009, Plaintiff returned to Dr. Byerly.  (*Id*. at 528.)  She reported little change in her positive and negative symptoms, although her mood was slightly improved.  (*Id*.)  She denied panic attacks or syncopal episodes.  (*Id*. at 528.)  She described mild to moderate sedation due to Seroquel.  (*Id*.)  Dr. Byerly assessed her as moderately ill but clinically stable.  (*Id*.)  He continued her medications, instructing her to return in a month.  (*Id*. at 529.)

Plaintiff missed another appointment with Metrocare on May 1, 2009.  (*Id*. at 437.)

On May 7, 2009, Plaintiff visited Dr. Byerly again, this time with complaints of increased depression, insomnia, and fatigue.  (*Id*. at 526.)  She denied suicidal ideation, panic attacks, and worsening of positive symptoms.  (*Id*.)  Dr. Byerly again assessed the severity of her illness as moderate; he continued her prescriptions and instructed her to return in a month.  (*Id*. at 527.) Plaintiff returned on June 4, 2009, complaining of increased depression.  (*Id*. at 524.)  She denied suicidal ideation, but stated that she struggled with daily living activities including household chores.  (*Id*.)  She also suffered a panic attack while looking for a job.  (*Id*.)  Dr. Byerly noted that Plaintiff's psychosis had not worsened.  (*Id*. at 525.)  He assessed the severity of her illness as

moderate, noting that her condition had worsened moderately since her last visit.  (*Id*. at 524.)  He continued her prescriptions and asked her to return the next month.  (*Id*. at 525.)

Plaintiff visited Metrocare on June 18, 2009, and reported that she was participating in a research study for Seroquel.  (*Id*. at 606.)  She alleged increased anxiety as well as auditory and visual hallucinations.  (*Id*.)  She slept well but had occasional nightmares.  (*Id*.)  She denied suicidal and homicidal ideations.  (*Id*. at 605.)  She was adequately groomed, her speech was normal, she was alert and oriented, and her memory and concentration were fair.  (*Id*. at 606.)  APN Simmons increased her dosage of Zoloft and continued her prescriptions for Klonopin, Seroquel, and valproic acid.  Plaintiff was instructed to return in 4 weeks or as needed.  (*Id*.)

On June 29, 2009, Plaintiff saw Dr. Byerly again.  (*Id*. at 514-15.)  She reported problems with delusions, hallucinations, and depression.  (*Id*. at 514.)  She also displayed marked cognitive impairments, including alogia and concrete thinking on formal testing.  (*Id*.)  Dr. Byerly continued her prescriptions for Seroquel, clonazepam, sertraline, valproic acid, and buspirone, and he provided her with a new prescription for Perphenazine.  (*Id*. at 514-15.)

That same day, Dr. Byerly completed a mental impairment questionnaire.  (*Id*. at 503-508.)  He assigned Plaintiff an Axis I diagnosis of schizophrenia and an Axis III diagnosis of asthma.  (*Id*. at 503.)  Her GAF score was 35, and her highest GAF in the past year was 39.  (*Id*.)  He noted that her response to treatment had been fair, but that she continued to have frequent hallucinations and fixed delusions that affected her behavior.  (*Id*.)  Her medications were listed as Seroquel, clonazepam, setrtaline, valproic acid, and buspirone.  (*Id*.)  She demonstrated very concrete thinking on her mental status test.  (*Id*.)  Dr. Byerly opined that her prognosis was poor, and that her condition was unlikely to change in the foreseeable future.  (*Id*.)

Dr. Byerly noted that Plaintiff suffered from delusions and hallucinations, poverty of content of speech and blunt affect, and emotional withdrawal and isolation. (*Id*. at 504.) He opined that she was markedly limited in her daily living activities, and she was extremely limited in maintaining social functioning and maintaining concentration, persistence, or pace. (*Id*. at 505.) She had suffered 4 or more episodes of decompensation of extended duration within the past 12 months. (*Id*.) Plaintiff had a medically documented history of a chronic organic schizophrenic disorder accompanied by three or more episodes of decompensation within 12 months, a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would cause her to decompensate, and a current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (*Id*. at 506.) Dr. Byerly found that she lacked a useful ability to function in every category related to mental abilities necessary for any kind of labor–including the ability to complete a normal workday and work week without interruptions from psychologically based symptoms, and the ability to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at 506-08.) He concluded that she had a very poor tolerance for emotional and cognitive stress, and that she could not work at all. (*Id*. at 508.)

APN Simmons completed a mental RFC assessment of Plaintiff on July 1, 2009.[4] (*Id*. at 510-12.) She opined that Plaintiff was substantially limited in her ability to understand and remember both simple and detailed instructions. (*Id*. at 510.) Plaintiff was substantially limited in her abilities to maintain regular attendance and punctuality within customary tolerances, concentrate and attend

---

[4] Dr. Sarah Rasco also signed the assessment; she noted that she reviewed the form although she had not seen the patient. (R. at 512.)

for extended periods, and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*.) She also concluded that Plaintiff was substantially limited in her ability to act appropriately with the general public, make simple work-related decisions, ask simple questions, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and behave in an emotionally stable manner. (*Id*. at 510-11.) She was extremely limited in her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id*. at 511.) APN Simmons noted that Plaintiff suffered from crying spells, anhedonia, appetite and sleep disturbances, paranoia, low energy, chronic mood disturbance, psychomotor agitation, confusion, chronic depression, suicidal thoughts, hallucinations, delusions, and anger. (*Id*.) She opined that Plaintiff was likely to miss more than 4 days a month due to her mental impairments or treatment, and that her mental impairments likely exacerbated the degree of disability she experienced due to physical impairments. (*Id*. at 512.) She also found that alcohol and drug use were not factors which impacted Plaintiff's mental impairments. (*Id*.)

Plaintiff missed a scheduled appointment with Metrocare on July 17, 2009. (*Id*. at 602.) She went to Metrocare on July 29, 2009, with complaints of auditory and visual hallucinations, fatigue, poor memory, and concentration problems. (*Id*. at 594.) She denied suicidal and homicidal ideations. (*Id*.) She stated that she was out of medication. (*Id*.) The treatment notes indicated that she was adequately groomed, and her speech was normal. (*Id*.) She was also alert and oriented, her memory and concentration were fair, and her thought processes were organized. (*Id*.) Her affect was sad and flat, however, and she was hypervigilant. (*Id*.) Her Adult-TRAG Dimension Ratings were 5 on employment; 3 on housing instability; 2 for support needs and functional impairment; and 1 for risk of harm, psychiatric-related hospitalizations, co-occurring substance abuse, and criminal

justice involvement. (*Id*. at 599.) Her GAF score was 45. (*Id*.) Her treatment goals were recorded as reduction in symptoms through ongoing treatment, education on the importance of complying with medications, and gaining insight into treatment. (*Id*.) APN Carol L. Starr refilled her prescriptions, and instructed her to return in 4 weeks or as needed. (*Id*. at 594.)

On September 1 and November 17, 2009, Plaintiff missed appointments with Metrocare. (*Id*. at 547-48.) She returned on November 30, 2009, for refills of her medication. (*Id*. at 551.) She was sleeping and eating normally; she also denied suicidal and homicidal ideations. (*Id*.) The treatment notes indicated that she was adequately groomed, cooperative, and her speech was normal. (*Id*.) She showed no sign of psychotic features. (*Id*.) In addition, her thoughts were organized, her affect was euthymic, she was alert and oriented, her memory was intact, her attention was normal, and she exhibited fair insight and judgment. (*Id*.) APN Simmons continued her prescriptions for Klonopin, Zoloft, Seroquel, and valproic acid, and instructed her to return in 8 weeks or as needed. (*Id*. at 552-53.) Plaintiff missed her appointment on December 31, 2009. (*Id*. at 554.)

Plaintiff visited Metrocare again on March 9, 2010. (*Id*. at 557.) She reported that she was doing well and felt much better, her medication helped her, and her symptoms were more manageable. (*Id*.) She no longer enjoyed activities she previously found pleasurable, however, and her energy and motivation levels were low. (*Id*.) She also described excessive worry, fatigue, guilt, irritability, sadness, and feelings of worthlessness. (*Id*.) She was sleeping and eating normally and had no suicidal and homicidal ideations. (*Id*. at 557-58.) The treatment notes indicated that she was adequately groomed and cooperative, and her speech was normal. (*Id*. at 557.) She showed no sign of psychotic features, her thoughts were organized, and her affect was euthymic. (*Id*.) She was alert and oriented, her memory was intact, her attention was normal, and she exhibited fair insight and

judgment.  (*Id*.)  Dr. Quazi Imam continued her prescriptions for Klonopin, Zoloft, Seroquel, and valproic acid, and instructed her to return in 8 weeks or as needed.  (*Id*. at 558-59.)

On April 2, 2010, Plaintiff visited Metrocare with complaints of increased anxiety and depression, auditory hallucinations, and sleep problems; she denied any appetite problems and suicidal or homicidal ideations.  (*Id*. at 561-62.)  She also complained that her breasts leaked due to the Seroquel.  (*Id*.)  Plaintiff was adequately groomed, cooperative, and her speech was normal.  (*Id*. at 561.)  She still showed no sign of psychotic features and her thoughts were organized.  (*Id*.)  Her affect was euthymic, she was alert and oriented, her memory was intact, her attention was normal, and she also exhibited fair insight and judgment.  (*Id*.)  APN Simmons discontinued Seroquel, and gave her prescriptions for loxapine and trazadone.  (*Id*. at 562.)  She increased Plaintiff's dosage of Zoloft and decreased her dosage of Klonopin.  (*Id*.)  Plaintiff returned on April 28, 2010.  (*Id*. at 565.)  She stated that her medication was working and she denied suicidal and homicidal ideations.  (*Id*.)  The treatment notes indicated that she was adequately groomed and cooperative; her speech was normal; she showed no sign of psychotic features; and her thoughts were organized.  (*Id*.)  She was alert, oriented, and exhibited fair insight and judgment.  (*Id*.)  APN Simmons continued her medications and told her to return in 4 weeks.  (*Id*.)

Plaintiff visited Metrocare again on May 26, 2010.  (*Id*. at 568.)  She complained of depression, anxiety, difficulty sleeping, crying spells, and auditory hallucinations.  (*Id*.)  The treatment notes showed that she was adequately groomed and cooperative, and her speech was normal.  (*Id*.)  Plaintiff's mood and affect were sad, but her thoughts were organized, she was alert and oriented, her memory was intact, her attention was normal, and she exhibited fair insight and judgment.  (*Id*.)  Her Adult-TRAG Dimension Ratings were 5 on employment; 3 on functional

impairment and housing instability; and 1 on risk of harm, psychiatric-related hospitalizations, co-occurring substance abuse, and criminal justice involvement.  (*Id*. at 572.)  Her GAF score was 45.  (*Id*.)  APN Simmons increased Plaintiff's dosages of Zoloft and loxapine, and discontinued her valproic acid prescription.  (*Id*. at 569.)  She continued her prescriptions for Klonopin and trazodone.  (*Id*.)  Plaintiff returned on July 14, 2010, as instructed.  (*Id*. at 576.)  She reported that her medication worked okay, although she sometimes experienced auditory hallucinations.  (*Id*.)  She denied suicidal and homicidal ideations.  (*Id*.)  The treatment notes indicated that she was adequately groomed and cooperative, and her speech was normal.  (*Id*.)  Her thoughts were organized, she was alert and oriented, her memory was intact, and she exhibited fair insight and judgment, but her affect was blunt.  (*Id*.)  Registered Nurse Christine Kellam-King continued her prescriptions, and told her to return in 6 weeks or as needed.  (*Id*.)

### 3.    Hearing Testimony

On July 30, 2009, Plaintiff, Renee McGaughy, Georgia Kimbrough, and a vocational expert testified in person at a hearing before the ALJ.  (*Id*. at 30-74.)  Plaintiff was represented by an attorney.  (*Id*. at 28.)

#### a.    *Plaintiff's Testimony*

Plaintiff was born January 24, 1976; she was 33 years old at the time of the hearing.  (*Id*. at 31.)  Her height was 5' 7", and she weighed 235 pounds.  (*Id*. at 37.)  She completed high school, attending some special education and some regular classes before being placed in special education full time.  (*Id*. at 31, 38.)  She learned to read and write.  (*Id*. at 38.)

Her last job was with Fossil in 2007 where she counted material for watches in the warehouse.  (*Id*. at 31-32.)  She held that job for approximately 6 months.  (*Id*. at 32.)  She left

because she made too many errors on the job; they let her resign instead of discharging her.  (*Id*.) While at Fossil, she was absent at least 2-3 times a month, and sometimes left early.  (*Id*. at 58.) Before that, Plaintiff worked at Salon D as a shampoo technician for about a year.  (*Id*. at 33.)  She left her job there because she could not get along with the stylists, and they got angry when she made mistakes.  (*Id*. at 34-35.)  Plaintiff worked at a Mary Kay warehouse prior to her job with Salon D.  (*Id*. at 35.)  It was a temporary job, so she worked only as needed.  (*Id*. at 36.)  Many of her jobs were in a warehouse environment, including a job at UPS.  (*Id*. at 35-36.)

Plaintiff could not work because she had to memorize how to perform her duties, but nothing stayed the same.  (*Id*. at 49.)  She got nervous and overwhelmed, and had panic attacks.  (*Id*.)  When she had a panic attack, she felt like she was dying–her breach was labored, her heart raced, her hands were sweaty, and her body shook.  (*Id*. at 57-58.)  She passed out sometimes.  (*Id*. at 58.)  She had panic attacks nearly every day.  (*Id*. at 50.)  She tried to calm herself down by counting, and if that did not work, she took medication.  (*Id*.)

Plaintiff had asthma and used an albuterol inhaler nearly every day; it made her anxiety worse.  (*Id*. at 37, 50-51.)  Sometimes she used a nebulizer machine.  (*Id*.)  She visited the hospital for asthma attacks, but her last visit was at least a year before.  (*Id*. at 51-52.)  Her asthma also interfered with her ability to work.  (*Id*. at 37.)  She also had bipolar disorder and schizophrenia. (*Id*. at 53, 55.)  The bipolar disorder made her moody– she experienced anger, crying spells, paranoia, and nightmares.  (*Id*. at 54.)  It made her want to stay home.  (*Id*.)  Plaintiff testified that her mental health history extended back to her school days.  (*Id*. at 37-39.)  She had visions of people beating on her, and she fought with other students.  (*Id*. at 38-39.)  She heard voices that told her to hurt herself, and she had hurt herself in the past.  (*Id*. at 39.)  She drank poison one time and

cut herself another time.  (*Id*.)  Her visions were all shapes and sizes; they did not look normal and sometimes attacked her in her sleep.  (*Id*. at 45.)

Although she was on medication, Plaintiff still had hallucinations.  (*Id*. at 45-46.)  Her medication made her feel drowsy, incoherent, and confused.  (*Id*. at 52.)  She had blackouts a lot.  (*Id*. at 52-53.)  At one time, her doctor thought it was a side effect of the Seroquel.  (*Id*. at 53.)  She saw Dr. Byerly as part of a paid drug study.  (*Id*. at 40.)  He gave her an increased dosage of her medication.  (*Id*.)  When the study ended, she returned to MHMR for treatment.  (*Id*.)

Plaintiff admitted to prior problems with cocaine and alcohol but claimed she had not used either substance in over two years.  (*Id*. at 46.)  She only tried cocaine a few times.  (*Id*.)  She drank the alcohol to try to block out the voices, or when she was depressed and wanted everything to stop.  (*Id*. at 46-47.)  She drank a lot more than she should have, but she stopped when a close friend talked to her about her drinking.  (*Id*. at 47.)  She did not have to attend a treatment program.  (*Id*. at 48.)

Plaintiff lived alone; her mother and sister helped with her rent.  (*Id*. at 42-43.)  Her children were 7, 8, and 10 years old at the time of the hearing.  (*Id*. at 43.)  They lived with their father; they visited her every other weekend during the school year and for longer periods during the summer.  (*Id*.)  She did not do much during the day.  (*Id*. at 42.)  She slept at night but did not feel rested, so she napped about 2 hours daily.  (*Id*. at 55.)  Her appetite was poor– sometimes she did not eat much for 2-3 days.  (*Id*. at 55-56.)  She forgot to take her medicine, and sometimes she ran out of it.  (*Id*. at 56.)  Her sister helped her keep up with her medicine and avoid alcohol.  (*Id*. at 56-57.)  Her family helped her dress and perform other activities.  (*Id*.)  She watched her 1 year old niece 2-3 times per week while her sister worked and no trouble doing so, although she had hallucinations on a daily basis.  (*Id*. at 43, 45, 52.)

Plaintiff never managed money on her own; she needed someone to handle any benefits she might receive.  (*Id*. at 48.)  She could not count money or make change.  (*Id*. at 56.)

### b.      *Renee McGaughy's Testimony*

Renee McGaughy identified herself as Plaintiff's best friend.  (*Id*. at 60.)  She had known Plaintiff for about 3 years, and they had lived together for most of that time.  (*Id*. at 61.)  She helped Plaintiff avoid alcohol.  (*Id*. at 63.)

Ms. McGaughy testified that Plaintiff's anxiety was really bad, especially when she was around a lot of people, or a lot of things were happening at once.  (*Id*. at 61.)  Sometimes she blacked out.  (*Id*.)  When that happened, she got a dazed look and became incoherent or lost consciousness.  (*Id*. at 60-61.)  The episodes lasted a few minutes.  (*Id*. at 61.)  Plaintiff also had mood swings, ranging from low or mellow to hyper-angry.  (*Id*. at 63.)  She had a hard time controlling herself when she was angry and sometimes had violent outbursts.  (*Id*.)  Plaintiff believed people were watching and following her, and she sometimes heard voices.  (*Id*.)

Plaintiff did not have a primary care physician; she went to MHMR and saw one other doctor for her mental health issues.  (*Id*. at 61.)  Otherwise, she was treated at the emergency room.  (*Id*.)

Plaintiff performed household chores with Ms. McGaughy's help–she could wash dishes but needed supervision.  (*Id*.)  Plaintiff also took care of her niece, but only when Ms. McGaughy was there.  (*Id*. at 62.)  Ms. McGaughy took the baby with her when she had to work.  (*Id*.)

### c.      *Georgia Kimbrough's Testimony*

Georgia Kimbrough was Plaintiff's mother; she testified that she saw her weekly and took care of Plaintiff's finances.  (*Id*. at 64.)

Ms. Kimbrough felt Plaintiff was unable to work because she had trouble when a lot of

people were around.  (*Id*.)  She had anxiety attacks; she sweated and hyperventilated.  (*Id*.)  Plaintiff went to the hospital for panic attacks a lot.  (*Id*. at 67.)

At one point, Ms. Kimbrough took Plaintiff to work with her in an effort to get her a job. (*Id*.)  Plaintiff was not able to focus on what was in front of her and required constant reassurance. (*Id*. at 65.)  She could not learn the necessary tasks, such as alphabetizing files, and never returned. (*Id*. at 66.)  Plaintiff always had a problem with focus and concentration.  (*Id*.)  She kept her niece, but only with the help of her friend Renee.  (*Id*. at 66-67.)  Plaintiff talked about things that did not happen, such as trips she took or things that she and her mother had done together.  (*Id*.)

### d.      VE Testimony

Dr. Thomas R. Irons, a vocational expert (VE), also testified at the hearing.  (*Id*. at 29, 68-74.)  He testified that Plaintiff's past relevant work included warehouse worker (medium, unskilled, SVP 2); packager hand (medium, unskilled, SVP 2); and small product assembler (light, unskilled, SVP 2).  Plaintiff's job as a shampoo technician did not have a DOT code; he estimated it as light, unskilled, with an SVP of 2.  (*Id*. at 57-58, 69.)

The ALJ asked him whether there were jobs at or below the medium exertion level that a hypothetical person of Plaintiff's age, education, and work experience could perform with the following limitations: never work around dust, pollution, and hazards such as heights or dangerous equipment; only perform simple routine work which required reasoning of 1-2 under the DOT; never work with the public.  (*Id*. at 69.)  The VE identified jobs as a packager hand (medium, unskilled, SVP 2, DOT 920.587-018), with 1,700 with jobs in Texas and 19,000 in the national economy; automobile detailer (medium, unskilled, SVP 2, DOT 915.687-034), with 1,200 jobs in Texas and 10,500 in the national economy; kitchen helper (medium, unskilled, SVP 2, DOT 318.687-010), with

6,400 jobs in Texas and 103,000 in the national economy; and housekeeping cleaner (light, unskilled, SVP 2, DOT 323.687-014), with 12,400 jobs in Texas, and 147,600 in the national economy. (*Id*. at 69-70.) He affirmed that his testimony was consistent with the DOT. (*Id*. at 71.)

The ALJ asked the VE whether a hypothetical person with the same limitations, but who would also be absent at least 3 days a month, would be able to maintain employment. (*Id*.) The VE opined that the hypothetical person would not be able to maintain employment. (*Id*.) The ALJ also asked about an employer's tolerance for a hypothetical person who had problems remaining focused and on task during a work-day. (*Id*.) The VE opined that a hypothetical person who was off task 10 minutes or more each hour (or 6.5 hours per week) would be precluded from competitive work. (*Id*.) He further opined that the hypothetical person would have to remain on task 85-90 percent of the time in order to avoid termination. (*Id*.)

Counsel asked the VE whether a hypothetical person of Plaintiff's age, education, and work experience with the same physical limitations expressed by the ALJ, but who also had a marked problem accepting instructions and responding appropriately to criticism from supervisors, could perform Plaintiff's past work. (*Id*. at 72.) The VE opined that the hypothetical person would not be able to perform in a competitive work environment. (*Id*.) Counsel also asked whether a hypothetical person who had multiple anger outbursts on the job would be terminated, and the VE opined that the hypothetical person would likely be discharged if the problem was not resolved. (*Id*.) Counsel then asked about a hypothetical person who could not maintain attention and concentration for at least 2 hours at a time. (*Id*.) The VE referred back to his testimony about the tolerance for remaining on task. (*Id*. at 73.) Counsel asked whether a hypothetical person would be able to maintain employment if she could not sustain an ordinary routine without special

23

supervision, could not work in coordination or proximity to others without being distracted, and could not perform at a consistent pace. (*Id*.) The VE opined that those limitations were covered by his testimony about time off task. (*Id*.) Counsel also asked about an employer's tolerance for a hypothetical person who could not handle normal work stress, and who had panic attacks that required her to isolate herself or leave work on a repetitive basis. (*Id*. at 73.) The VE stated that it depended on how much lost time was involved, e.g., the hypothetical person would not be able to sustain competitive employment if she missed more than 6.5 hours of work each work. (*Id*. at 74.)

**C.**   *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 23, 2010. (*Id*. at 14-24.) At step 1, the ALJ found that Plaintiff was fully insured for disability under Title II through December 31, 2012. (*Id*. at 15.) She also found that Plaintiff had not engaged in substantial gainful activity since September 5, 2007. (*Id*.) At step 2, the ALJ found that Plaintiff had the following severe impairments: schizophrenia, anxiety, asthma, obesity, and a history of poly-substance abuse. (*Id*.) At step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*.)

The ALJ next determined that Plaintiff had the RFC to perform work of medium exertion, as defined in 20 C.F.R. § 404.1567(c), with the following limitations: lift and carry 50 pounds occasionally and 25 pounds frequently; uncompromised ability to sit, stand, and walk; never work with exposure to excessive dust or pollutants; never work around dangerous machinery or heights; only perform simple, routine work-related tasks. (*Id*. at 17.) The ALJ further determined that Plaintiff could maintain work at the described level. (*Id*.)

At step 4, the ALJ found that Plaintiff was incapable of performing her past relevant work. (*Id*. at 22.)  At step 5, the ALJ found that Plaintiff was classified as a younger individual on her alleged onset date.  (*Id*. at 23.)  The ALJ further determined that she had a limited education and was able to communicate in English.  (*Id*.)  She found that transferability of job skills was not an issue because all of Plaintiff's past relevant work was unskilled.  (*Id*.)  She then found that there were other jobs that Plaintiff could perform which existed in significant numbers in the national economy, such as hand packager, with 1,700 jobs in Texas and 19,000 in the national economy; auto detailer, with 1,200 jobs in Texas and 10,500 jobs in the national economy; and kitchen helper, with 6,400 jobs in Texas and 103,000 in the national economy.  (*Id*. at 23-24.)  Accordingly, she determined that Plaintiff was not disabled within the meaning of the Social Security Act between September 5, 2007 and the date of her decision.  (*Id*. at 24.)

## II.  ANALYSIS

### A.      *Legal Standards*

#### 1.        Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (per curiam).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination under a claim for disability benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*. at 436 and n. 1.

### 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential 5-step analysis to determine whether a claimant is

disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first 4 steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the 5-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

27

**B.**      *Issues for Review*

Plaintiff raises the following issues for review:

1.    Unless the correct severity standard is used by the ALJ in the disability evaluation, the claim must be remanded to the Commissioner for reconsideration. Remand is also necessary when the severity standard used is ambiguous. Did the ALJ create ambiguity requiring remand when [s]he cited to *Stone* but also stated the incorrect severity standard?

2.    A residual functional capacity (RFC) finding must be supported by substantial evidence. The ALJ found Gills capable of light work with minimal non-exertional limitations. Is the ALJ's RFC finding supported by substantial evidence?

(Doc. at 17-1 at 5.)[5]

**C.**      *Severity Standard*

Plaintiff contends that remand is required because the ALJ used an incorrect severity standard at step 2. (*Id*. at 13-16.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c) (2012). Finding that a literal application of this regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

---

[5]   Citations refer to the cm/ecf system page number at the top of each page rather than the page numbers at the bottom of each filing.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c) [(2012)] is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).   Notwithstanding this presumption, courts must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, the ALJ stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 14.) The next sentence read that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id*.)   Furthermore, after announcing her finding at step 2, the ALJ stated that "[a]ll impairments have been considered under the standard set forth in *Stone v. Heckler*." (*Id*. at 15.) However, unlike the ALJ's articulation of the severity standard, *Stone* provides no allowance for a *minimal*, and much less a *significant*, interference with a claimant's ability to work.   The ALJ therefore applied an incorrect standard of severity. *See Neal v. Comm. of Social Sec. Admin.*, No. 3:09-CV-0522-N, 2009 WL 3856662, at *1 (N.D. Tex. Nov. 16, 2009) ("Even though citation to *Stone* may be an indication that the ALJ applied the correct standard of severity, nowhere does *Stone* state that the ALJ's citation to *Stone*, without more, conclusively demonstrates that he applied the correct standard."); *see also Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3 (N.D.

Tex. Jan. 26, 2010) (explaining that courts in this district have consistently rejected, as inconsistent with *Stone*, the regulatory definition of severity that the ALJ cited in this case).

However, as recently held by the Fifth Circuit and courts within this district, *Stone* error does not mandate automatic reversal and remand, and application of harmless error analysis is appropriate in cases where the ALJ proceeds past step 2 in the sequential evaluation process.  *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (per curiam) (applying harmless error analysis to alleged *Stone* error); *see also Hall v. Astrue*, No. 3:11-CV-1929-BH, 2012 WL 4167637, at *11 (N.D. Tex. Sept. 20, 2012); *Jones v. Astrue*, 821 F. Supp.2d 842, 851 (N.D. Tex. 2011).  "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, *without consideration of the remaining steps in the sequential analysis*, claims of those whose impairment is more than a slight abnormality." *Anthony*, 954 F.2d at 294 (emphasis added).  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, the ALJ found at step 2 that Plaintiff had the following severe combination of impairments: schizophrenia, anxiety, asthma, obesity, and a history of poly-substance abuse.  (*Id*. at 15.)  After step 3, she found that Plaintiff had the following RFC:  lift and carry 50 pounds occasionally and 25 pounds frequently; uncompromised ability to sit, stand, and walk; never work with exposure to excessive dust or pollutants; never work around dangerous machinery or heights; only perform simple, routine work-related tasks.  (*Id*. at 17.)

The ALJ explained that in assessing Plaintiff's RFC, she had considered "all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with

the objective medical evidence and other evidence." (*Id.* at 19.)  Consideration of "all of the relevant medical and other evidence" as well as all "medically determinable impairments . . . including [those] that are not 'severe'" is required when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(1)-(3).  The ALJ acknowledged Plaintiff's depression and PTSD diagnoses in her RFC narrative discussion.  (*Id.* at 17-22.)  She also expressly recognized that Plaintiff could only perform simple, routine tasks.  (*Id.* at 17.)

At step 4, the ALJ found that Plaintiff was incapable of performing her past relevant work, so she proceeded to step 5.  (*Id.* at 22-24.)  After considering Plaintiff's RFC, she concluded that Plaintiff could perform numerous jobs existing in significant numbers in the national economy.  (*Id.* at 23.)  Although she did not find that Plaintiff's major depressive disorder and PTSD were severe impairments at step 2, she sill considered their effects on her ability to work throughout the disability analysis as required by the regulations.  Therefore, it is inconceivable that she would have reached a different conclusion regarding the effects of Plaintiff's depression and PTSD on her ability to work if she had applied the correct severity standard at step 2.  Accordingly, the ALJ's failure to apply the *Stone* severity standard at step 2 was harmless error that does not warrant remand.

**D.    *Credibility*[6]**

Plaintiff contends that the ALJ failed to properly assess her credibility and that her reasons for rejecting her subjective complaints are not supported by the record.  (Doc. 17-1 at 21-24.)

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991) (per curiam).  The ALJ is in the best position to assess a claimant's

---

[6] Although Plaintiff did not separately list credibility as an issue, she briefed it as part of the RFC issue. Because it involves a different legal analysis, this argument is addressed separately.

credibility because she "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n. 18 (5th Cir. 1994).   In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process.  SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).   First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  *Id*.  Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.   *Id*.   If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements.  *Id*.;  *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985) (per curiam)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects.  SSR 96-7p, 1996 WL 374186, at *2.  The regulations also provide a non-exclusive list of factors that the ALJ must consider.  *See* 20 C.F.R. § 404.1529(c) (2011).[7]  Nevertheless, the Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and she must articulate her reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant."  *Falco*, 27 F.3d at 163.

---

[7]  These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ acknowledged a link between Plaintiff's alleged symptoms and her medically determinable impairments but concluded from objective and other medical evidence that she was not entirely credible. She specifically found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with" the evidence of her RFC. (R. at 20, 22.) The ALJ found that Plaintiff's impairments could be expected to produce some of her symptoms but not to the degree claimed. (*Id*.) Her decision reflects that she reviewed the evidence before applying several of the credibility factors listed in SSR 96-7p. (*Id*.) She considered Plaintiff's course of treatment, hearing testimony and the medical evidence before determining that her subjective complaints were not completely credible. (*Id*. at 17-22.) The ALJ considered Plaintiff's daily activities–caring for her three children and her infant niece, caring for her personal hygiene, preparing meals, and visiting outside her home. (*Id*. at 19-20, 22.) She noted Plaintiff's sporadic work history, as well as her substantial earnings in 2006 and her 2009 job search, finding them inconsistent with an individual who considered herself precluded from employment. (*Id*. at 20.) She reviewed treatment records from Metrocare and Dr. Byerly's documentation of Plaintiff's symptoms between April 2007 and June 2009. (*Id*. at 17-22.) She cited Plaintiff's history of inconsistent treatment and noncompliance with medications, as well as her failure to seek in-patient treatment, as evidence that her condition was not as limiting as alleged. (*Id*. at 20-21.) These findings justify the conclusions of the ALJ. *See Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987). Although not in a formalistic fashion, she considered the factors for determining credibility, and relied on substantial evidence to support her determination. Remand is not required on this issue.

33

### E.      *Treating Physician Rule*[8]

Plaintiff contends that the ALJ erred because she failed to give proper weight to the opinions of the treating and examining physicians.  (Doc. 17-1 at 25-28.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  20 C.F.R. § 404.1527(c)(2)*; Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion:  (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(c)(1)-(6).

---

[8]  As with credibility, this argument was briefed as part of the RFC issue and not listed separately.  It is likewise addressed separately because it requires a different legal analysis.

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453 (emphasis in original). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Plaintiff argues that the ALJ rejected the opinions of Drs. Byerly and Mount regarding the extent of her functional limitations and substituted her judgment for that of the doctors who treated and examined Plaintiff. (*Id.* at 26-28.) The ALJ did not ignore or reject the medical evidence from Drs. Byerly and Mount. She relied on it in assessing the severity of Plaintiff's mental impairments at step 2 and 3, and she considered it at length in her RFC narrative discussion. (R. at 18-22.) She relied on medical notes from both examining and treating sources in arriving at her RFC finding and gave copious explanations for the opinions she found unsupported by the record as a whole. (*Id.*)

The ALJ implicitly based her mental RFC finding on the RFC assessment completed by Dr. Reddy, the SAMC.  (*Id*. at 22.)  Dr. Reddy's opinions were founded in large part on Dr. Mount's report.  (*Id*. at 266.)  The ALJ could accord greater weight to Dr. Reddy's mental RFC findings than to Dr. Byerly's opinions about Plaintiff's mental limitations because an ALJ may accept a consulting physician's opinion that is well-supported over a treating physician's opinion.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (holding that the ALJ "was justified in accepting the opinion of [a non-treating, consultative physician] . . . that was supported by the evidence, and in rejecting the [opinion] of a . . . treating physician that was contrary to the evidence.") (citing to 20 C.F.R. § 404.1526).

Nor did the ALJ err in rejecting Dr. Byerly's opinion that Plaintiff was "unable to work at all."  (*Id*. at 508.)  Section 404.1527(d) does not apply to opinions that a claimant cannot work or is disabled.  *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (per curiam).  Treating physicians' opinions regarding a claimant's disability are legal conclusions and have no special significance.  20 C.F.R. § 416.927(e); *Frank*, 326 F.3d at 620.  Because physicians generally define "disability" in a manner distinct from the Act, an ALJ may properly reject any conclusion of disability as determinative on the ultimate issue.  *See Tamez v. Sullivan*, 888 F.2d 334, 336, n. 1 (5th Cir. 1989) (doctor's note that claimant was "disabled" did not mean that the claimant was disabled for purposes of the Act).  Remand is therefore not required on this issue.

**F.**     ***RFC Determination***

Plaintiff also argues that the ALJ's RFC finding did not include all of her limitations that were supported by the evidence in the record.  (Doc. 17-1 at 18-21.)  Plaintiff essentially contends that the ALJ's mental RFC conflicted with her earlier finding that Plaintiff was mildly limited in her

social functioning and moderately limited in concentration, persistence, and pace. (Doc. 17-1 at 19.) She further argues that the ALJ failed to consider the opinions of Dr Byerly and ANP Simmons regarding her mental RFC.  (*Id.* at 20.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Determining a claimant's mental RFC involves consideration and analysis of the record and "draw[ing] meaningful inferences and allow[ing] reasonable conclusions about the individual's strengths and weaknesses."  *Cline v. Astrue*, 577 F. Supp.2d 835, 848 (N.D. Tex. 2008) (citing SSR 85-16 (PPS-120), 1985 WL 56855, at *2 (S.S.A. Nov. 30, 1984).

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco*, 27 F.3d at 164.  A reviewing court must defer to the ALJ's decision when

substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* A "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ determined at step 2 that Plaintiff's schizophrenia, anxiety, asthma, obesity and history of poly-substance abuse were severe impairments. (R. at 15.) The ALJ found at step 3 that none of her impairments met or equaled a listed impairment pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1, and proceeded to assess Plaintiff's RFC. (*Id.* at 15, 17-21.) She found that Plaintiff had the RFC to perform medium work with the following limitations: lift and carry 50 pounds occasionally and 25 pounds frequently; uncompromised ability to sit, stand, and walk; never work with exposure to excessive dust or pollutants; never work around dangerous machinery or heights; only perform simple, routine work-related tasks. (*Id.* at 17.)

The ALJ did not err in assessing Plaintiff's mental RFC. The categories of daily living activities, social function, and concentration, persistence and pace (assessed in the PRT) are utilized in steps 2 and 3. *See Baker v. Colvin*, No. 3:11-CV-3497-M-BH, 2013 WL 1103265, at *20 n. 10 (N.D. Tex. Mar. 18, 2013). The criteria considered in the PRT

> *are not an RFC assessment* but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment

used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in . . . the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."

SSR 96-8p, 1996 WL 374184, at *5 (emphasis added); *see also Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012).[9]  In determining Plaintiff's mental limitations, the ALJ considered the record as a whole–particularly the medical evidence from all treating and examining sources.  (*Id*. at 22.)  She considered the RFC assessments submitted by Dr. Byerly and APN Simmons.  (*Id*. at 21.)  As noted in section II.E., the ALJ considered Dr. Byerly's opinion as to Plaintiff's mental RFC but ultimately determined that a less restrictive RFC (as indicated by the SAMC's assessment) was better supported by the evidence of record.  (*Id*. at 18-19, 21-22.)  She also gave less weight to APN Simmons' evaluation, finding that it was an "other" source rather than an "acceptable source" of medical evidence, and that her assessment of Plaintiff's symptoms was not borne out by the treatment records.  (*Id*. at 21.)

Because the disability determination falls within the purview of the ALJ, she was not required to accept either Dr. Byerly's or APN Simmons' conclusions.  *See Frank*, 326 F.3d at 620; 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  As the fact-finder, the ALJ had the sole responsibility for deciding whether their opinions were supported by the record.  *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton*, 209 F.3d at 452 ("Conflicts in the evidence are for the [ALJ] . . . to resolve.").  Accordingly, substantial evidence supports the ALJ's RFC determination as to Plaintiff's mental limitations, and remand is not warranted.

---

[9]  Specific mental activities which must be considered and addressed in the RFC include: understanding, remembering and carrying out instructions; using judgment in work-related decisions; responding appropriately to supervision, co-workers and work situations; and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1545(c); SSR 96-8p, 1996 WL 374184, at *6.

### III.  CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED**, this 29th day of March, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE